JoAnn REED, Plaintiff–Appellant,

v.

Clarence C. SHEPARD, in his official capacity as Sheriff of Vanderburgh County, Indiana, Otto Schnakenburg, Sr. and Jim Embry, in their official capacities as Members of Vanderburgh Merit Board, et al., Defendants–Appellees.

No. 90–2340.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1991.
Decided Aug. 8, 1991.

F. Stephen Sheets (argued), Evansville, Ind., for plaintiff-appellant.

David V. Miller, Arthur D. Rutkowski, James P. Casey (argued), and Mary R. Gidcumb, Bowers, Harrison, Kent & Miller, Evansville, Ind., for defendants-appellees.

Before WOOD, Jr., POSNER and MANION, Circuit Judges.

MANION, Circuit Judge.

In 1984 JoAnn Reed was terminated from her job with the Vanderburgh County Sheriff's Department. Consequently, she brought a two-count lawsuit against the Sheriff (in his official capacity), the Sheriff's Department, and other assorted defendants who were ultimately dropped from the case. Count I of her complaint alleged under 42 U.S.C. § 1983 that her termination from the department took place without the statutorily required notice and hearing, violating her right to due process under the Fourteenth Amendment. In Count II she brought separate charges of sexual discrimination, harassment and retaliation under 42 U.S.C. § 2000e et seq. (Title VII). By joint motion of the parties the trial was bifurcated, so that Reed's due process allegations were heard separately by a jury and her allegations of sexual discrimination, sexual harassment, and retaliation were heard in a bench trial. During the trial on the § 1983 claim, the judge directed a verdict against Reed after the presentation of her evidence, finding no due process violation. After a bench trial on the Title VII count, the judge ruled in favor of the Sheriff and Sheriff's Department. Reed appeals both decisions. We affirm the district court.

A. *Facts*

JoAnn Reed is a white female who worked as a "civilian jailer" for the Vanderburgh County Sheriff's Department. She began working in the Vanderburgh County Jail on May 5, 1979, and her main duties included guarding, feeding, processing, and transporting prisoners who were detained in the jail. Reed was fired from the department in 1984 by the Sheriff for alleged misconduct. Due to her ancillary status in the department, she was dismissed without a hearing or an opportunity to have the termination decision examined by the established Merit Review Board.

The civilian jailer position was created by the Sheriff for cost-saving purposes in 1976. The idea was to create a specialized class of jail employee which would not require the level of training, and thus, not have the variety of duties associated with deputy sheriffs. Reflective of their diminished training and duties, the civilian jailers would also have a lower and more economical pay scale. Reed carried a Sheriff's Department photographic identification card which designated her position with the Sheriff's Department as a "civilian jailer."

Deputy Sheriffs in Vanderburgh County are statutorily entitled to have recommended disciplinary measures imposed by the Sheriff (i.e., suspension, termination, reduction in rank, reprimands, etc.) reviewed and dispensed by the Vanderburgh County Sheriff's Merit Board (see Ind.Code §§ 36–8–10–3 and 36–8–10–11). The civilian jailer position, as testified to by numerous witnesses, did not provide or include Merit Board review of termination or other disciplinary matters. Civilian jailers were

considered to be "at-will" employees serving at the pleasure of the Sheriff. The occupational distinction between deputy sheriffs and civilian jailers is an important one to make because Reed's § 1983 due process claim is rooted in her belief that she was a deputy sheriff and was therefore entitled to Merit Board review of her termination. Since the Merit Board declined to review or rule on the propriety of her termination, Reed believes she was denied due process. Significantly, on two occasions during her tenure as a civilian jailer, Reed attempted to complete the application to become a deputy sheriff. On the application Reed acknowledged that she had "been employed as a civilian employee of Vanderburgh County." In both instances Reed failed to complete the application form and did not submit to the physical fitness test, the Sheriff's interview, or the Merit Board interviews as required by the application process for a deputy sheriff. She did not complete any of the requisites to go to the Indiana Law Enforcement Academy for the ten-week training course as required for deputy sheriffs by Indiana state law.

Reed claims to have been continually harassed and discriminated against by members of the Vanderburgh County Sheriff's Department during her four and one-half years as a civilian jailer. To substantiate her claim, Reed specified incidents of discriminatory conduct practiced by the Sheriff's Department. Reed contends that she did not have locker facilities available like the male deputies, that she did not have a proper ladies' lavatory available at the jail, and that she was required to perform onerous duties in addition to those tasks relating to the management of the jail. She also alleged the customary complaints concerning discrimination in pay, promotion, and benefits. The Sheriff responds by saying that the differential treatment catalogued by Reed is a function of occupational differences and not sex discrimination. Deputies received locker assignments but not civilian jailers due to resource limitations. Pay, promotion, and benefit variances between deputies and jailers were

consistent with differences in occupational status; all jailers, male and female, were treated similarly in compensation and in other respects. The department also contends that any tasks Reed did on the department's behalf in addition to her jail duties were strictly voluntary.

On the surface the most disturbing part of her complaint and of the trial record relate to the sex-based harassment Reed encountered at her workplace. According to the testimony, the Vanderburgh County Jail resembled a combination of a modern version of TV's *Barney Miller*, with the typically raunchy language and activities of an R–rated movie, and the antics imagined in a high-school locker room. The trial was replete with grim stories concerning how the deputies and jailers liked to entertain themselves during slow periods at the jail. The district court's summary more than adequately sets the tone for the unprofessional atmosphere that prevailed during "slow time" at the jail.

> Plaintiff contends that she was handcuffed to the drunk tank and sally port doors, that she was subjected to suggestive remarks ..., that conversations often centered around oral sex, that she was physically hit and punched in the kidneys, that her head was grabbed and forcefully placed in members laps, and that she was the subject of lewd jokes and remarks. She testified that she had chairs pulled out from under her, a cattle prod with an electrical shock was placed between her legs, and that they frequently tickled her. She was placed in a laundry basket, handcuffed inside an elevator, handcuffed to the toilet and her face pushed into the water, and maced. Perhaps others.[1]

The record confirms these and a number of other bizarre activities in the jail office. By any objective standard, the behavior of the male deputies and jailers toward Reed revealed at trial was, to say the least, repulsive. But apparently not to Reed.

Reed not only experienced this depravity with amazing resilience, but she also relished reciprocating in kind. At one point

---

1. Unpublished opinion of Judge Gene E. Brooks, dated May 25, 1990, p. 9.

during her job tenure Reed was actually put on probation for her use of offensive language at the jail. At the same time she was instructed to suspend the exhibitionistic habit she had of not wearing a bra on days she wore only a T-shirt to work. She also participated in suggestive giftgiving by presenting a softball warmer to a male co-worker designed to resemble a scrotum and by giving another a G-string. Reed enjoyed exhibiting to the male officers the abdominal scars she received from her hysterectomy which necessarily involved showing her private area. Many witnesses testified that Reed reveled in the sexual horseplay, instigated a lot of it, and had "one of the foulest mouths" in the department. In other words, the trial revealed that there was plenty of degrading humor and behavior to go around.

The trial court further observed:

... several of the deputies and the Sheriff ... testified her propensity to use foul language is well known, and that she told many dirty jokes, often with sexual innuendos. No doubt some of the allegations on both sides are true, however the conclusion from the testimony must be that plaintiff participated freely in many of these antics and in fact instigated some of them.

\* \* \* \* \* \*

The Court heard testimony from three (3) females who were employed by the Vanderburgh County Sheriff's Department during plaintiff's tenure in both Civilian Jailer and Deputy Sheriff positions. Jackie Trail, Sandy Schuler and Paula Buickel all testified that they had not been discriminated against in the terms and conditions of employment nor had they been physically or verbally harassed. At least one female deputy testified that she heard both the plaintiff and deputies tell dirty jokes. She said she didn't appreciate it and told the officers if they wanted to tell the jokes do it somewhere else. They did. Plaintiff admits she never told the deputies that she was offended by the language and actions.[2]

But her activities were apparently not limited merely to crude behavior. In April of 1984, a Vanderburgh County Deputy Sheriff made a report to the Vanderburgh County Sheriff's Department which stated that information coming from some prisoners indicated that Reed was involved in trafficking marijuana to some inmates in the Vanderburgh County Jail. The report was brought to the attention of Sheriff Clarence Shepard who initiated an investigation based on the report's strength. The investigation disclosed that some months prior to the drug incidents Reed had encouraged two female inmates to assault and beat another inmate with whom they shared a cell. Two of the inmates involved issued sworn statements attesting to Reed's involvement and incitement of the beating. Other sources corroborated the statements.

The investigation was completed on June 8, 1984. The Sheriff ordered the jail captain and a detective to confront Reed with the allegations. What happened next is unclear. The Sheriff's Department claims that Reed confessed to the allegations and offered to resign. Reed claims that she denied the allegations but was nevertheless told to resign quietly or face termination on the basis of the alleged improper conduct. The end result was that on June 9, 1984, the day after her meeting with the jail captain and the detective, Reed was terminated from her job.

Complicating this situation is an event which Reed claims is the actual cause of her termination. On June 6, 1984, three days before she was fired, Reed, along with several other women who worked in the jail, had a meeting with Sheriff Shepard. Reed claims that at the meeting she discussed with the Sheriff "the unequal application of policies and procedures in the jail," notably the unequal conditions between male employees and female employees in terms of work environment and pay. She testified that she demanded remedies from the Sheriff. Reed claims her firing was in retribution for her attempt to stand

2. Unpublished opinion of Judge Gene E. Brooks, dated May 25, 1990, pp. 10–11.

up for her rights during this meeting. The Sheriff and other women present at the meeting have a different version of what happened, one that does not include Reed's purported aggressive confrontation with the Sheriff on matters relating to possible sex discrimination.

After her termination, Reed filed a complaint with the Equal Employment Opportunity Commission, and received from them a right-to-sue letter. Reed filed a complaint in U.S. District Court against Sheriff Shepard in his official capacity and the Vanderburgh County Sheriff's Department claiming (a) she was in reality a deputy sheriff, entitled to Merit Board review of adverse employment action and as such, her termination without review constituted a denial of her property interest in her job without due process of law contrary to the Fourteenth Amendment and actionable under 42 U.S.C. § 1983, and (b) differences in pay, promotion and benefits based on sex coupled with the "sexual harassment in the form of verbal harassment and physical restraint" she experienced at the Vanderburgh County Jail, violated her statutory rights to be free from sexual discrimination in the workplace under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

The district court conducted separate trials for the § 1983 count and the Title VII count. For the § 1983 count, the court held that Reed was employed as an "at will" civilian jailer lacking any right to Merit Board review of adverse action; therefore her termination did not result in a due process violation since she had no property interest in her job and had no statutory right of review of adverse administrative action. Under the Title VII count, the court held that there was no evidence of sexual discrimination at the jail. The court further held that Reed's admitted toleration of her atrocious work environment in addition to her willing participation in the crude shenanigans prevented her, under prevailing doctrine, from succeeding in a suit for sexual harassment. Moreover, the court concluded that the sexual harassment was not the basis for her termination. Reed, the court found, was validly termi-

nated for reasons relating to substantiated allegations concerning her illegal conduct in the jail.

### B. § 1983 Claim

The district court entered a directed verdict against Reed at the close of her evidence on her § 1983 claim alleging denial of due process. Reviewing the district court's decision on the Sheriff's motion for a directed verdict, we must determine *de novo* "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." *Cygnar v. City of Chicago,* 865 F.2d 827, 834 (7th Cir.1989) (quoting from *Tice v. Lampert Yards, Inc.,* 761 F.2d 1210, 1213 (7th Cir. 1985)).

At trial, Reed presented only two pieces of evidence to support her contention that she was a *de facto* deputy sheriff entitled to Merit Board review of her termination. One was that she was issued and wore the uniform of a sheriff's deputy. That may be a start, but a deputy must do more than dress the part. This portion of the trial revealed that Reed was hired as a civilian jailer, pursuant to a Vanderburgh County ordinance authorizing the creation of such a position. The purpose of the civilian jailer was to relieve deputies from having to perform the routine jail-related tasks so they could devote their time to the more important patrol duties for which they were specially trained. The lower-paid civilian jailers also provided relief for the Sheriff's budget. Reed was hired as a civilian jailer, paid as a civilian jailer, carried a Sheriff's Department card identifying her as a civilian jailer, and worked in the jail. Twice she failed to complete the deputy's application form, and never attended Indiana's mandatory 10-week training school for deputies. Reed and other civilian jailers were not entitled to participate in the pension fund established for deputy sheriffs, nor did they qualify to participate in the life insurance program catering to deputy sheriffs. In short, civil-

ian jailers were not intended to be deputies, nor did they function as deputies.

Secondly, Reed claims deputy status because she received the *Vanderburgh County Sheriff Rules & Regulations Manual.* She claims that because she was given the manual and because the manual prescribes Merit Board review for disciplinary measures against deputies (e.g., terminations), she is entitled to Merit Board review of her termination. This misapprehends the fundamental purpose of the manual in general and the rules outlined in it concerning the administration of discipline in particular.

The manual is a basic employees handbook containing information relating to policies and procedures affecting all Sheriff's Department employees in the following areas: sick leave policy, accumulation of and application for vacation time, press relations, public relations, overtime compensation, legitimate use of firearms and deadly force, and a code of conduct and ethics. One section of the manual is titled "Administration of Discipline and Right of Appeal." The manual and the disciplinary rules are very careful to distinguish between two classes of employees in the Sheriff's Department, namely, "members of the department" and "officers." "Officers" occupy positions whose existence, "classification," "rank," and "grade" are the mutual creations of the Sheriff and the Merit Board.[3] Indeed, the disciplinary rules expressly limit Merit Board review to "disciplinary action against an officer." Nowhere in the rules is Merit Board review expressly or impliedly linked to discipline of "members of the department" who are not "officers."

Reed failed to submit any evidence showing that she was an "officer" (i.e., occupying a position the creation of which the Merit Board approved, and over which the Merit Board established controlling standards, conditions, and qualifications). In

fact, the evidence suggests that the jailer position was strictly a creation of the Sheriff who conditioned such employment to be "at will." Reed admits to having been alerted at the outset of her employment (and continuously throughout her employment) that she was a civilian "at will" employee. Moreover, Reed fails to present any evidence suggesting that under the rules non-"officers" were entitled to Merit Board review of suggested discipline. As such, we agree with the district court's conclusion that Reed's interest in her job was not protected by statute or rule and that Reed was not denied due process when she was terminated without Merit Board review. The district court properly directed the verdict in this § 1983 count where no constitutionally recognizable interest was demonstrated to be at stake, and the state action was not unjustifiably arbitrary or unfair.

## C. *Title VII Claim*

42 U.S.C. § 2000e–2(a)(1) (Title VII of the Civil Rights Act of 1964) states:

> (a) It shall be an unlawful employment practice for an employer—
>
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; . . .

42 U.S.C. § 2000e–5(g) states:

> (g) If the [United States district] court finds that the respondent has intentionally engaged in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practices, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstate-

---

**3.** The relevant definition reads:
POLICE OFFICERS:
[t]he Sheriff, with the approval of the [Merit] Board, shall establish a classification of ranks, grades, and positions for county police officers in the department. For each rank, grade,

and position established, the Sheriff with the approval of the Board shall set reasonable standards of qualifications and fix the prerequisites of training, education, and experience. *Vanderburgh County Sheriff Rules & Regulations Manual,* p. 5.

ment or hiring of employees with or without back pay, ... or any other equitable relief as the court deems appropriate ...

Reed claims that the discrimination she experienced at the Sheriff's Department took three forms. First, she claims that she was discriminated against on the basis of sex in the compensation, terms, and conditions of her employment at the jail and was fired because of her complaints to the Sheriff regarding such disparate treatment. Second, she claims that the sexual harassment she encountered at the jail contributed to a hostile work environment which is generally actionable as sexual discrimination under Title VII. Third, she claims that she was the victim of retaliation by the Sheriff's Department for failing to drop her suit against the department.

### 1. Sexual Discrimination

■ In *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1988), the Supreme Court emphasized the framework for analyzing a case alleging discrimination on the basis of sex.

> First, the Plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination [disparate treatment and/or impact]. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's [termination]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination.

450 U.S. at 252–253, 101 S.Ct. at 1093.

Reed believes that the Vanderburgh County Sheriff's Department terminated her because she participated in meetings where she claims she complained about disparate treatment of females by the department regarding lockers, restroom facilities,

and jail procedures. Thus, Reed concludes that the real reason for her termination was her sex and contends that the investigation of her encouragement of the alleged beating of a prisoner was pretext used to make her termination appear legitimate. The trial court ruled for the Sheriff and the Sheriff's Department. With respect to Reed's allegations of sex discrimination at the Sheriff's Department the court stated: "[p]laintiff's [Reed's] version is unsupported by any reliable testimony other than her own testimony.... Plaintiff's demeanor on the witness stand suggests a lack of credibility. This Court concludes that Plaintiff's sole testimony on the pretext issue lacks credibility and is not sufficient to prove pretext by a preponderance of the evidence." [4]

Indeed, the defense brought in testimony from other female and male civilian jailers who testified that there was a "female only" lavatory located in the female civilian jailer office available to all female employees. Although female jail employees did not have lockers, an alternative was provided by the Sheriff's office in the form of a locked file cabinet in a locked office. In fact, a former male civilian jailer testified that he, in contrast to the women, was not even provided a locked office or file cabinet in which to securely place his personal property.

The evidence at trial clearly established that both males and females served in the position of civilian jailer and that both male and female jailers received exactly the same pay and lacked locker facilities. Civilian jailers participated in different pension plans and group life insurance policies than deputy sheriffs. Numerous females employed in the jail either as civilian jailers or deputy sheriffs testified that they had not experienced discrimination. They also confirmed that the "disparate treatment" of which Reed complained was based upon a person's position with the department (civilian jailer v. deputy sheriff) as opposed to sex (male v. female). In short, there

**4.** Unpublished opinion of Judge Gene E. Brooks, dated May 25, 1990, pp. 30–31.

was no impermissible disparate treatment based on sex.

■ Even though the court concluded that Reed had failed to prove the *prima facie* case of discrimination, the court still went on to discuss and validate the Sheriff's legitimate nondiscriminatory reasons for firing Reed. The court was persuaded by the credibility of the Sheriff's witnesses that the department had serious and legitimate grounds to believe that Reed had participated in misconduct in the jail: misconduct which would have resulted in an employee's termination regardless of the offender's sex. The court concluded that Reed was released for her role in instigating the beating of an inmate by other inmates. This was deemed a violation of Reed's duty to act in the interest of the public trust, in violation of her oath as a department member to uphold Indiana law and in violation of the rules and regulations of the department. It was also well-documented that the investigation of Reed's participation in the beating incident antedates by several months Reed's meeting with the Sheriff where she allegedly confronted the Sheriff about discrimination in the department and for which she believes she was fired. The district court's decision that Reed was terminated for legitimate reasons which did not amount to discriminatory pretext is in full accordance with the evidence submitted at trial.

2. Sexual Harassment

■ The Supreme Court in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* at 66, 106 S.Ct. at 2405. In concluding that "hostile environment" harassment violates Title VII, the Court held that Title VII affords the employee the right to work in an environment free from discriminatory intimidation, ridicule, and insult. However, "for sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment'." *Id.* at 67, 106 S.Ct. at 2405 (quoting from *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). In further qualifying the justiciability of sexual harassment claims, the Supreme Court stated: "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome'.... [T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact ..." *Id.* at 68, 106 S.Ct. at 2406. "The correct inquiry is whether [the victim] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation ... was voluntary." *Id.*

The district court in the present case found that "[Reed] ... admits that the [harassing] incidents charged by her did not affect her job performance."[5] Additionally, the court found that "[Reed] was a willing and welcome participant until other incidences, not related at all to any harassment, cost her job."[6]

Much of the evidence at trial emphasized Reed's enthusiastic receptiveness to sexually suggestive jokes and activities. The record of this case reveals numerous instances indicating that Reed's preferred method of dealing with co-workers was with sexually explicit jokes, suggestions and offers. As one witness put it, referring to the frequency of Reed's sex-related joking, "JoAnn—I mean, that was her way. There was not ever a time that I can recall of ever speaking to her that there wasn't some kind of sexual contact made with reference to rear-ends, ... or she would be the best or whatever." (Tr. 1151) This sentiment was repeated often by other witnesses. From the foregoing, the district court is justified where it held: "The Court finds that language and sexually explicit jokes were used around plaintiff because of

---

5. Unpublished opinion of Judge Gene E. Brooks, dated May 25, 1990, p. 28.

6. *Id.*

her personality rather than her sex."[7]

Reed was quizzed on why she tolerated without complaint activity she now characterizes as harassing and abusive. At trial she claimed:

> Because it was real important to me to be accepted. It was important for me to be a police officer and if that was the only way that I could be accepted, I would just put up with it and kept [sic] my mouth shut. I had supervisors that would participate in this and you had a chain of command to go through in order to file a complaint. One thing you don't do as a police officer, you don't snitch out [sic] another police officer. You could get hurt." (Tr. 675)

Although Reed suggests that tolerating and contributing to the crudeness of the jail was necessary for her career, other female employees testified that the male jail employees did not behave in this manner around women who asked them not to. The trial court's conclusion that Reed welcomed the sexual hijinx of her co-workers is strongly supported by the evidence presented at trial. This showing that she welcomed the activity is fatal to her claim, particularly where Reed admits that the "harassment" did not adversely affect her ability to do her job. At least as significant is her acknowledgment that her termination was not related to the sexual harassment, but stemmed from her refusal to resign. In fact, even if there had been harassment or a hostile environment (which we conclude there was not), when a discharge is for legitimate, non-pretextual reasons other than harassment, the plaintiff cannot find relief under Title VII. See *Swanson v. Elmhurst Chrysler–Plymouth, Inc.*, 882 F.2d 1235, 1237, 1239 (7th Cir.1989). We agree with the trial court's holding in this regard that, "[t]he defendants cannot be held liable for conditions created by [Reed's] own action and conduct."[8]

3. Retaliation.

■ Reed contends that she was retaliated against because of her refusal to resign from the Vanderburgh County Sheriff's Department. This retaliation, Reed claims, took the form of having the Sheriff's Department's investigation file concerning her alleged illegal jail activities investigated by a grand jury, a mysterious attack on her person by a disguised assailant urging her to drop her case against the department, disturbing late-night phone calls threatening her with reprisals for her lawsuit, and someone shooting at her car with a gun while she was driving—all allegedly occurring after her termination.

42 U.S.C. § 2000e–(3)(a)(1) in pertinent part reads:

> (a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice ... or because he has made a charge [relating to the occurrence of an unlawful employment practice].

This subsection has been constructed to prohibit an employer from pursuing retaliatory measures (like termination) against an employee for exercising his or her rights under Title VII. A claim of retaliation in contravention of Title VII prompts a three-part analysis as set forth by this court in *Jennings v. Tinley Park Comm.*, 864 F.2d 1368 (7th Cir.1988). These three elements of a prima facie case for retaliation under Title VII which plaintiff must prove by a preponderance of the evidence are: 1) the employee was engaged in a protected activity; 2) the employee suffered adverse employment action; and, 3) there was a causal connection between the protected activity and the adverse action.

■ The district court was correct when it held that Reed failed to satisfy any part of this test. The court held that Reed did not engage in protected activity (i.e. file a complaint against employer charging discrimination) while employed by the Sheriff's Department, and that the alleged retaliatory activities took place *after* the termination of Reed's employment and was

**7.** *Id.* at 11.

**8.** *Id.* at 28–29.

therefore not an adverse employment action. Under § 2000e–3(a), it is an employee's discharge or other employment impairment that evidences actionable retaliation, and *not* events subsequent to and unrelated to his employment. Moreover, under § 2000e–3(a), if the employer in a Title VII retaliation action produces a legitimate nondiscriminatory explanation for the adverse action, the employee bears the ultimate burden of proving retaliation by demonstrating that the employee's proffered reason is pretextual. *Ross v. Communication Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985); *see also Collins v. State of Illinois*, 830 F.2d 692, 698 (7th Cir.1987). As we have discussed earlier, Reed did not prove the Sheriff's reasons for firing her were pretext. If the Sheriff's office were implicated in Reed's alleged post-termination beating and shooting, Reed may have had a state law damage claim and perhaps a criminal charge. But Title VII does not address such claims.

For all the foregoing reasons, the judgment of the district court in all respects is

AFFIRMED.