**Charles T. ROBINSON, Sr.,**
**Plaintiff–Appellant,**

**Equal Employment Opportunity**
**Commission, Amicus**
**Curiae,**

v.

**SHELL OIL COMPANY,**
**Defendant–Appellee.**

**No. 93–1562.**

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 26, 1995.

Decided Nov. 29, 1995.

**ARGUED:** Allen Martin Lenchek, Washington, DC, for Appellant. John Foster Suhre, Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae. Lawrence Christopher Butler, Houston, TX, for Appellee. **ON BRIEF:** James R. Neely, Jr., Deputy General Counsel, Gwendolyn Young Reams, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae.

Before ERVIN, Chief Judge, and RUSSELL, WIDENER, HALL, MURNAGHAN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Judges RUSSELL, WIDENER, WILKINS, NIEMEYER, LUTTIG, and WILLIAMS joined. Judge HALL wrote a dissenting opinion, in which Chief Judge ERVIN and Judge MICHAEL joined. Judge MURNAGHAN also wrote a dissenting opinion, in which Chief Judge ERVIN joined. Judge WILKINSON and Judge MOTZ did not participate in this case.

**OPINION**

HAMILTON, Circuit Judge:

Section 704(a) of Title VII of the Civil Rights Act of 1964 (commonly referred to as Title VII's anti-retaliation provision) makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment" who have either availed themselves of Title VII's protections or assisted others in so doing. *See* 42 U.S.C.A. § 2000e–3(a) (West 1994). Subsection 2000e(f) of Title VII defines "employee" as "an individual employed by an employer." *See* 42 U.S.C.A. § 2000e(f) (West 1994). The issue before the *en banc* court is whether the term "employees" includes former employees. We conclude that it does not.

I.

Shell Oil Company (Shell) terminated Charles T. Robinson (Robinson) from its employment in 1991. Shortly thereafter, Robinson filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging that Shell had terminated him because of his race. While that charge was pending, Robinson applied for a job with another company that contacted Shell, as Robinson's former employer, for an employment reference. According to Robinson, Shell gave him a negative reference. Robinson attributed the negative reference to Shell's intention to retaliate against him for filing the EEOC charge.

Robinson subsequently filed this action. Robinson's complaint alleged that after he filed a charge of race discrimination against Shell with the EEOC, Shell provided "false information and negative job references to perspective [sic] employers." (J.A. 6). The complaint further alleged that such action violated the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C.A. § 2000e–3(a) (West 1994).

Contending the anti-retaliation provision of Title VII does not provide former employees a cause of action against their former employers for post-employment retaliation, Shell moved to dismiss the complaint on the ground that it failed to state a claim upon which relief could be granted, *see* Fed. R.Civ.P. 12(b)(6). In support of its motion, Shell cited *Polsby v. Chase*, 970 F.2d 1360 (4th Cir.1992), which held that the anti-retaliation provision of Title VII does not apply to former employees. Upon Shell's motion, the district court dismissed the complaint. Subsequently, the Supreme Court summarily va-

cated *Polsby*. *See Polsby v. Shalala*, —— U.S. ——, 113 S.Ct. 1940, 123 L.Ed.2d 646 (1993).[1]

Robinson appealed to this court. A divided panel of this court reversed the judgment of the district court, *see Robinson v. Shell Oil Co.*, No. 93–1562, 1995 WL 25831 (4th Cir. January 18, 1995) (designated for publication, but not reported), but, on Shell's suggestion, we vacated the panel decision and reheard the case *en banc*. We now affirm.

## II.

Section 704(a) of Title VII of the Civil Rights Act of 1964 provides in pertinent part:

> (a) It shall be an unlawful employment practice for an *employer* to discriminate against any of his *employees or applicants for employment* ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e–3(a) (West 1994) (emphasis added). In reviewing the propriety of the district court's dismissal of Robinson's complaint, our task is to apply Title VII's anti-retaliation provision to the facts before us. The dispute regarding the correct application centers on the scope of the term "employees." Robinson asserts the term "employees" includes former, as well as current, employees. According to Robinson, this interpretation is favorable because it gives effect to the remedial purpose of Title VII to eradicate illegal discrimination in the work place. Conversely, relying on the plain language of the statute, Shell asserts that the term "employees" includes only current employees.

### A.

■ Initially, it is helpful to lay out the all too familiar framework of statutory interpretation. Courts are charged with the duty to apply the law that Congress enacted. Accordingly, "[w]e begin, as we must, by examining the statutory language, bearing in mind that we should give effect to the legislative will as expressed in the language." *United States v. Murphy*, 35 F.3d 143, 145 (4th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988)). In examining statutory language, generally, words are given their common usage, and "[c]ourts are not free to read into the language what is not there, but rather should apply the statute as written." *Id.* We must acknowledge that the duty of this court is to adhere faithfully to the rules of statutory interpretation rather than to "exercise[ ] a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship." *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930).

■ If a statute defines a term in its definitional section, then that definition controls the meaning of the term wherever it appears in the statute. *See Florida Dep't of Banking & Fin. v. Board of Governors of Fed. Reserve Sys.*, 800 F.2d 1534, 1536 (11th Cir.1986) (definition of term in definitional section of statute controls construction wherever that term appears throughout the statute), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987). As a general rule "[a] definition which declares what a term means ... excludes *any* meaning that is not stated." 2A George Sutherland, *Statutes and Statutory Construction* § 47.07, at 152 (5th ed.1992) (emphasis added).

■ Our inquiry must cease if the statutory language is unambiguous and " 'the stat-

---

1. The Supreme Court vacated this court's judgment in *Polsby* and remanded the case to this court "for further consideration in light of the position asserted by the Acting Solicitor General in his brief for the United States filed March 5, 1993." *Polsby v. Shalala*, —— U.S. ——, 113 S.Ct. 1940, 123 L.Ed.2d 646 (1993). Because the Supreme Court vacated *Polsby* on this ground, no meaningful argument can be made

that the Supreme Court in any way addressed the merits of the present issue or concluded *Polsby* to be legally incorrect. *See United States Dep't of Health & Human Servs. v. Federal Labor Relations Auth.*, 983 F.2d 578, 581–82 & n.2 (4th Cir.1992) (adopting reasoning of vacated opinion where vacatur did not address the issue). In light of the Supreme Court's action, we write on a clean slate.

utory scheme is coherent and consistent.'" *Murphy*, 35 F.3d at 145 (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989)). In other words, if the statutory language "'is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion.'" *Id.* (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). "The language being facially clear and 'within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.'" *Id.* (quoting *Caminetti*, 242 U.S. at 485, 37 S.Ct. at 194).

■ There are, however, rare and narrow exceptions when courts may stray beyond the plain language of unambiguous statutes. *Id.* One such circumstance arises if the literal application of statutory language would lead to an absurd result. *See Crooks*, 282 U.S. at 59–60, 51 S.Ct. at 50–51. Only, however, "under rare and exceptional circumstances" do courts find that literal application of statutory language would lead to an absurd result. *Id.* at 60, 51 S.Ct. at 50. In such cases, the absurdity "must be so gross as to shock the general moral or common sense. And, there must be something to make plain [Congress' intent] that the letter of the statute is not to prevail." *Id.* (internal citations omitted).

■ Another circumstance permitting courts to look beyond the plain meaning of unambiguous statutory language arises if literal application of the statutory language would produce a result demonstrably at odds with the intent of Congress; in such cases, the intent of Congress rather than the strict language controls. *See Ron Pair Enters., Inc.*, 489 U.S. at 242, 109 S.Ct. at 1031 ("The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters. In such cases, the intention of the drafters, rather than the strict language controls.") (internal quotation marks and citation omitted). To come within the ambit of this exception, however, the

contrary intent must have been clearly expressed by the legislative body. *See Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 298–99, 78 L.Ed.2d 17 (1983). Most importantly, in the absence of expressed Congressional intent, we must assume that Congress intended to convey the language's ordinary meaning. *See United States v. Goldberger & Dubin, P. C.*, 935 F.2d 501, 506 (2d Cir.1991) ("The words of a statute should be given their normal meaning and effect in absence of showing that some other meaning was intended."); *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir.1989) ("In the absence of a contrary indication, the court must assume the drafters of a statute intended to convey the ordinary meaning attached to the language.").

■ If the plain language of the statute is ambiguous, then a court may look beyond the plain language to the legislative history for guidance. *See United States v. Southern Management Corp.*, 955 F.2d 914, 920 (4th Cir.1992) (recognizing that courts should look to other sources of legislative intent if the statutory language does not convey a clear meaning).

Observant of this well-established analytical framework for statutory analysis, we now turn to the statute at hand.

### B.

■ In deciding whether Title VII's anti-retaliation provision provides a former employee a cause of action against his former employer for post-employment retaliation, we find the statutory language unambiguously answers the question "no." First, we look at the language Congress used: "It shall be an unlawful employment practice for an *employer* to discriminate against any of his *employees or applicants for employment* ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3(a) (West 1994) (emphasis added). Subsection 2000e(f) defines "employee" for purposes of all provisions of Title VII as "an individual employed by an employer." 42 U.S.C.A. § 2000e(f) (West 1994). Read *in pari mate-*

*ria,* these sections of Title VII provide a remedy for acts of retaliation to *employees* and *applicants for employment* who have either availed themselves of Title VII's protections or assisted others in so doing.

Although subsection 2000e(f) defines the term "employee" as "an individual employed by an employer," Robinson contends, rather remarkably, that the term "employees" as used in Title VII's anti-retaliation provision means "former employees." His contention is legally untenable. Title VII defines "employee" for purposes of all provisions of Title VII; thus, that definition controls the meaning of "employee" wherever it appears throughout the statute. *See Florida Dep't of Banking & Fin.,* 800 F.2d at 1536. Because Title VII *does not* define "employee" as an individual *no longer employed* by an employer, then, under the rules of statutory construction, that meaning is excluded as a meaning from the term "employee." *See Statutes and Statutory Construction* § 47.07, at 152. We are simply prohibited from reading into the clear language of the definition of "employee" that which Congress did not include. *See Murphy,* 35 F.3d at 145. If Congress intended Title VII to remedy discrimination beyond the employment relationship, then it could have easily done so by including "former employee" when defining the term "employee."

Neither is the language comprising Title VII's definition of the term "employee" ("an individual employed by an employer," 42 U.S.C.A. § 2000e(f) (West 1994)), ambiguous. The rules of statutory construction require us to give the words Congress used to define "employee" their common usage. *See Murphy,* 35 F.3d at 145. The term "employed" as used in subsection 2000e(f) is commonly used to mean "performing work under an employer-employee relationship." *Black's Law Dictionary* 525 (6th ed.1990). Certainly, the term "employed" is not commonly used to mean "no longer performing work under an employer-employee relationship." Furthermore, "employer" as used in subsection 2000e(f) is commonly used to mean "one who employs the services of others." *Id.* Again, no meaningful argument can be made that the term "employer" is commonly used

to mean "one who no longer employs the services of others." Accordingly, we reject any notion that the language in Title VII's definition of the term "employee" is ambiguous.

Because the language in Title VII's definition of "employee" is not ambiguous, any attempt to resort to legislative history is foreclosed. *See Murphy,* 35 F.3d at 145. Therefore, this court is bound to apply literally the term "employees" in Title VII's anti-retaliation provision as defined by Congress in subsection 2000e(f) without examination of any other sources of legislative intent, unless such application falls within one of the exceptions to literal application. *Id.*

Here, neither exception applies because both require Congress to have made plain that it intended a result different than literal application would produce. Indeed, the absence of any language in Title VII's anti-retaliation provision referring to former employees is strong evidence that Congress did not intend Title VII to protect former employees. Additionally, Congress' inclusion of "applicants for employment" as persons *distinct* from "employees," coupled with its failure to likewise include "former employees," is strong evidence of Congressional intent that the term "employees" in Title VII's anti-retaliation provision does not include former employees. With no applicable exception to prevent literal application of the words Congress chose, we hold, as we must, that the meaning of the term "employees" in Title VII's anti-retaliation provision does not include former employees as urged by Robinson. Because "former employees" are not included in the statutory language, Title VII's anti-retaliation provision does not protect them. Given that the statute does not protect former employees, Robinson has no claim under its aegis.

### C.

Although the rules of statutory construction do not require us to proceed further, several other important considerations support our interpretation of the anti-retaliation provision. First, the types of practices that Title VII forbids strongly point toward the scope of its anti-retaliation provision not ex-

tending beyond the employment relationship. The types of practices that Title VII forbids are particularly related to *employment, not* post-employment relationships. For example, Title VII specifically defines "unlawful employment practice" in part as the failure or refusal "to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e–2(a)(1) (West 1994). This definition comprises discrimination with respect to certain aspects of employment, and does not redress discriminatory practices *after* the employment relationship has terminated.

Second, Title VII's anti-retaliation provision does not redress post-employment retaliation because the second element of a *prima facie* case of retaliation under Title VII requires the employee to suffer an "adverse employment action" that necessarily entails conduct that occurs during the employment relationship. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989); *see also Reed v. Shepard*, 939 F.2d 484, 492–93 (7th Cir.1991). Adverse employment action necessarily requires that the adverse action taken by the employer must be in relation to its own act of *employing* the employee bringing the charge. Consequently, any adverse action taken after the employment relationship has terminated cannot be actionable under Title VII. Recognizing this point, the *Reed* court stated that because "the alleged retaliatory activities took place *after* the termination of Reed's employment" those activi-

ties were "not an adverse employment action." *Reed,* 939 F.2d at 492–93.

Given the types of practices that Title VII forbids, it follows that Congress drew the line defining the scope of Title VII at its most logical place—the termination of the employment relationship. Title VII does not redress discriminatory practices, however reprehensible, which occur after the employment relationship has ended. Rather, Congress specifically enacted the anti-retaliation provision so that applicants/employees falling victim to discrimination during their applications for employment and/or employment would be able to invoke Title VII to protect their rights without fear of retaliation.

### D.

We are not unmindful that our holding is embraced by only one circuit court [2] and at odds with the majority of circuit courts that have addressed this question.[3] In concluding that Title VII's anti-retaliation provision and other parallel statutes reach post-employment retaliation, the decisions in the majority have interpreted the term "employee" broadly to " 'include[ ] a former employee as long as the alleged discrimination is related to or arises out of the employment relationship.' " *Passer,* 935 F.2d at 330 (quoting *Cosmair, Inc., L'Oreal Hair Care Div.,* 821 F.2d at 1088); *see Pantchenko,* 581 F.2d at 1055. Essentially, the rationale supporting this interpretation is that a literal application of the term "employees" produces a result that would defeat the underlying policies of Title VII to eradicate discrimination in the work place. *See, e.g., Charlton,* 25 F.3d at 200; *Passer,* 935 F.2d at 331; *Bailey,* 850 F.2d at

**2.** *See Reed,* 939 F.2d at 492–93.

**3.** *See Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 198–200 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994); *Passer v. American Chem. Soc'y,* 935 F.2d 322, 331 (D.C.Cir.1991) (holding "employees" under Age Discrimination in Employment Act's (ADEA) parallel retaliation provision includes former employees as long as the alleged discrimination is related to or arises out of the employment relationship); *Bailey v. USX Corp.,* 850 F.2d 1506, 1509 (11th Cir.1988); *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.,* 821 F.2d 1085, 1088 (5th Cir.1987) (holding "employees" under ADEA's parallel retaliation provision includes former em-

ployees as long as the alleged discrimination is related to or arises out of the employment relationship); *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 869 (9th Cir.1982), *overruled on other grounds by Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477, 1481–82 (9th Cir.1987) (*en banc*); *Pantchenko v. C.B. Dolge Co.,* 581 F.2d 1052, 1055 (2d Cir.1978); *Rutherford v. American Bank of Commerce,* 565 F.2d 1162, 1165 (10th Cir. 1977); *Dunlop v. Carriage Carpet Co.,* 548 F.2d 139, 142 (6th Cir.1977) (holding "employee" under Fair Labor Standard Act's anti-retaliation provision includes former employees). *Cf. EEOC v. J.M. Huber Corp.,* 927 F.2d 1322, 1331 (5th Cir.1991).

1509; *Rutherford,* 565 F.2d at 1165–66. For example, in *Charlton,* the court opined that "post-employment blacklisting is sometimes more damaging than on-the-job discrimination because an employee subject to discrimination on the job will often continue to receive a paycheck while a former employee subject to retaliation may be prevented from obtaining any work in the trade or occupation previously pursued." *Charlton,* 25 F.3d at 200.

The rationale of these decisions totally disregards, without explanation, the established analytical framework for statutory construction. Instead, they rely on broad considerations of policy. Most divine what they posit as Congress' intent from the reach of Title VII. *See, e.g., Charlton,* 25 F.3d at 200. None of these decisions directly address the absence of Congressional expression on this issue. These decisions are, therefore, at odds with the well-settled rule that in the absence of expressed Congressional intent, courts must assume that Congress intended to convey the language's ordinary meaning. *See Goldberger & Dubin, P. C.,* 935 F.2d at 506; *Stokley,* 881 F.2d at 116. Indeed, these decisions fail to heed the Supreme Court's repeated mandate: "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)) (internal citations omitted). Furthermore, these decisions of our sister circuits disregard Title VII's definition of "employee" as the definitive source for determining the meaning of the term "employees" as used in Title VII's anti-retaliation provision. In short, we are completely unpersuaded by their analyses, which depend for their substance on broad policy arguments which are simply not supported by the plain language of Title VII.

### III.

Although extending Title VII to cover former employees is tantalizing fruit, our judicial inquiry must cease when the language of a statute is plain and unambiguous. Such is the rule of law. In no uncertain terms, Congress, for whatever reason, has chosen, through the anti-retaliation provision of Title VII, to protect "employees," *i.e.,* "individual[s] employed by an employer," and "applicants for employment," but not to protect former employees. Because Robinson's complaint alleges post-employment retaliation, the district court properly dismissed his complaint under Federal Rule of Civil Procedure 12(b)(6). Accordingly, we affirm.

*AFFIRMED.*

K.K. HALL, Circuit Judge, dissenting:

Imagine that on Friday, the first day of the month, XYZ Corporation decides to terminate two of its line workers, Smith and Jones, and immediately gives them two weeks' written notice. Smith and Jones, each believing that she has been unlawfully discriminated against, file charges with the EEOC on Monday the fourth. Unable, however, to afford the luxury of undue optimism, both Smith and Jones explore the possibility of signing on with XYZ's competitor, LMNOP, Inc.

On Tuesday the twelfth, XYZ's personnel department receives a letter from its LMNOP counterpart, requesting employment information and references on Smith and Jones. Annoyed that the pair have filed EEOC charges against the company, XYZ's personnel director intentionally and vindictively prepares false reports for dissemination to LMNOP. The spurious reports are placed in separate envelopes and stamped for mailing on Friday the fifteenth, which also happens to be Smith and Jones's last day at XYZ. Although Smith's report is included in Friday's outgoing mail, Jones's report is inadvertently excluded, and, therefore, not sent to LMNOP until Monday the eighteenth.

The majority cannot dispute that XYZ's conduct toward Smith and Jones was equally culpable, and that the company's behavior was precisely that which Title VII's anti-

retaliation provision was designed to prohibit. Nevertheless, under the approach adopted today by the majority—an approach in diametric opposition to that employed by the vast preponderance of our sister circuits and by the EEOC itself—Smith would be entitled to file a retaliation charge, and Jones would be left out in the cold. Because the majority's decision will soon create many more Joneses than Smiths, I must respectfully dissent.

## I.

### A.

The majority acknowledges that, even if the term "employees" as used in Section 704(a) unambiguously designates only those persons earning a paycheck from the offending employer at the moment of retaliation, this court may nevertheless expand the scope of the designation to avoid a grossly absurd or plainly unintended result.[1] As illustrated by the XYZ hypothetical, the majority's construction of Section 704(a) *will* inevitably lead to grossly absurd results; that those results are also plainly unintended can be readily understood by examining Congress's purpose in enacting Title VII.

### B.

"In determining the meaning of [a] statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) (citations omitted). The statutory scheme in this case is Title VII, and Congress's purpose in enacting it is easily discerned.

Title VII is sweeping, remedial legislation; it applies to virtually all entities that affect the employment relationship, and it proscribes a vast range of ignoble behavior.[2] There is a detailed enforcement procedure— including resort to the federal courts, which are accorded broad power to grant legal and equitable relief.[3] Congress demonstrated, by giving Title VII a broad reach, that it is serious about eradicating discrimination and its invidious effects within the employment relationship. That is why the statute was enacted, and that is why the anti-retaliation provision was included; Congress understood that Title VII could only be enforced effectively if the persons most aggrieved by discriminatory practices could come forward without fear of retribution. Unfortunately, the majority's construction of the term "employees" in Section 704(a) will actively hinder the enforcement mechanism.

This hindrance will work on two levels. There is, of course, the obvious hindrance of

---

1. See ante at 328–29 (citing *Crooks v. Harrelson*, 282 U.S. 55, 59–60, 51 S.Ct. 49, 50–51, 75 L.Ed. 156 (1930), and *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240–42, 109 S.Ct. 1026, 1029–31, 103 L.Ed.2d 290 (1989)). See also *NLRB v. Wheeling Electric Co.*, 444 F.2d 783, 787 (4th Cir.1971):

    The cardinal rule of statutory construction is that the intent of the legislative assembly is to be given effect . . . and where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, or produces an absurd result, courts must look beyond the plain words of the statute. (citations omitted); *Crosse & Blackwell Co. v. FTC*, 262 F.2d 600, 606 (4th Cir.1959) (eschewing a literal reading of the Federal Trade Commission Act where such an interpretation was "plainly at variance with the policy of the legislation as a whole" (quoting *Ozawa v. United States*, 260 U.S. 178, 43 S.Ct. 65, 67 L.Ed. 199 (1922)), and would produce an absurd result).

2. Various provisions of Sections 703 and 704 apply to employers, employment agencies, labor organizations, and joint labor-management committees. Section 703 prohibits, with few exceptions, all forms of discrimination in all aspects of the employment relationship on the basis of an individual's race, color, religion, gender, or national origin. 42 U.S.C.A. § 2000e–2 (West 1994). Section 704, in addition to the anti-retaliation provision at issue in this case, prohibits the publication in most cases of job notices or advertisements indicating a preference based on a suspect classification.

3. Section 706(g) empowers the court to order declaratory relief, injunctive relief such as reinstatement or hiring of employees with or without back pay, or "any other equitable relief as the court deems appropriate." 42 U.S.C.A. § 2000e–5(g) (West 1994). In addition, Section 102 of the Civil Rights Act of 1991 permits courts, in an appropriate case, to award compensatory and punitive damages for violations of Sections 703 and 704 of Title VII. 42 U.S.C.A. § 1981a (West 1994).

allowing an employer to escape sanctions for behavior that is clearly unlawful.[4] More subtle, however, is the hindrance on enforcement that will almost certainly result from the remaining employees' reluctance to bring subsequent violations to the EEOC's attention; no reasonable employee will come forward if there is any chance that his or her term of employment will soon end, thus giving the employer carte blanche to retaliate. Moreover, an aggrieved person should not be forced to remain with an abusive employer solely to ensure that he or she receives the full protection of Title VII.

## C.

Today's decision erodes a crucial Title VII enforcement mechanism; it thus will inevitably erode the substantive protections of Title VII itself. Because Congress's inclusion of Section 704(a) was intended to strengthen—not weaken—the statute, I would interpret the section's language in a manner consistent with that intent.

My interpretation of Section 704(a) hardly brands me a maverick; indeed, the majority's approach is the eccentric one. No fewer than six courts of appeal have concluded, as I do, that the section's protection extends to those employees no longer actively engaged in working for the retaliating employer.[5] Until now, the Seventh Circuit had stood alone in reaching the opposite conclusion. *See Reed v. Shepard*, 939 F.2d 484, 492–93 (7th Cir.1991).[6] Moreover, the EEOC itself has appeared before this court, as *amicus curiae*, to urge that we adopt the dominant rule fashioned by our sister circuits.

Two of those courts have explicitly concluded that the primary focus in determining whether a plaintiff states a claim under Section 704(a) should be on whether the alleged retaliation either arose from the employment relationship or was related to the employment.[7] I wholeheartedly agree. By choosing instead to focus exclusively on the time when the employee was actively working, the majority has framed its inquiry much too narrowly; such a myopic approach only frustrates Congress's attempt, through Title VII, to eradicate workplace discrimination.[8]

---

**4.** The dawn of the brave new world envisioned by the majority will not escape the attention of employers, who will soon enough realize that they have been given a free rein to retaliate against disfavored employees, so long as the employee is first terminated. At XYZ Corporation, there may never be another Smith.

**5.** *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 198–200 (3d Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994); *EEOC v. J.M. Huber Corp.*, 927 F.2d 1322, 1331 (5th Cir.1991) (*citing EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1088 (5th Cir.1987)); *Bailey v. USX Corp.*, 850 F.2d 1506, 1509–10 (11th Cir.1988); *O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864, 869 (9th Cir.1982), *overruled on other grounds by Atonio v. Wards Cove Packing Co., Inc.*, 810 F.2d 1477, 1481–82 (9th Cir.1987) (en banc); *Pantchenko v. C.B. Dolge Co., Inc.*, 581 F.2d 1052, 1055 (2d Cir.1978); *Rutherford v. American Bank of Commerce*, 565 F.2d 1162, 1165 (10th Cir.1977). *See also EEOC v. Ohio Edison Co.*, 7 F.3d 541 (6th Cir.1993) (former employee may state a claim under Section 704(a) on something akin to an agency theory where offer of reinstatement is withdrawn in retaliation for the actions of another employee—the plaintiff's husband—in protesting his wife's discharge). Still another circuit has construed the nearly identical anti-retaliation provision of the Age Discrimination in Employment Act to apply to former employees. *See Passer v. American*

*Chem. Soc'y*, 935 F.2d 322, 330–31 (D.C.Cir. 1991).

**6.** In *Reed*, the court of appeals affirmed a directed verdict for the defendants on the plaintiff's retaliation claim, because the complained-of activities took place after the plaintiff had been terminated.

**7.** *See Charlton*, 25 F.3d at 200 ("an employee may file a retaliation action against a previous employer for retaliatory conduct occurring after the end of the employment relationship when the retaliatory act is in reprisal for a protected act ... and *arises out of or is related to the employment relationship*."); *Pantchenko*, 581 F.2d at 1055 ("the statute prohibits discrimination *related to or arising out of an employment relationship*, whether or not the person discriminated against is an employee at the time of the discriminatory conduct.") (emphases added).

**8.** In the instant case, Shell's alleged retaliation against Robinson—said to involve the dissemination of false information and an undeserved poor reference—arose from the parties' employment relationship because Shell would not have been provided the opportunity to retaliate against Robinson but for that relationship. Shell's alleged retaliation was also related to the employment because it assumed the form of facts and opinions about Robinson's professional affiliation with Shell.

## II.

To this point, I have accepted, for the purposes of argument, the majority's contention that the term "employees," as used in Section 704(a), is unambiguous. I have argued that the result arrived at by the majority is nevertheless grossly absurd and so clearly contrary to Congressional intent as to justify expanding the asserted ordinary meaning of the term to embrace, if necessary, an extraordinary meaning.

In actuality, my burden is not as difficult as the majority purports it to be. If it were, it is unlikely that six other courts of appeal, comprised of judges who are doubtlessly familiar with the canons of statutory construction, would have all arrived at a conclusion that the majority of this court apparently finds so bewildering.

I believe it likely that our sister circuits have, at least implicitly, grounded their decisions on a premise that I find inescapable—that the term "employees" is ambiguous. Indeed, under the statute's tautological definition of the term as "individual[s] employed by an employer," *see* 42 U.S.C.A. § 2000e(f) (West 1994), one could no more comprehend what an employee is than one could ascertain the legal essence of the term designee, if defined merely as an "individual designated by a designator." To comprehend the meaning of employee (or designee), one must first understand what it means to employ (or to designate). The root "employ," of course, may mean many different things, even within the business/labor context; though it is often used to describe the current contractual relationship between a company and a designated worker, that is not its exclusive meaning.[9] Where the use of a term in a particular context admits of more than one meaning, that term is, *ipso facto*, ambiguous.

## III.

Because the term "employees," as used in Section 704(a) is ambiguous, it is our duty to construe its meaning. I choose to interpret the term consistently with what I perceive to be the clear intent of Congress to effectively remedy the problem of discrimination in employment—a problem that today's decision will not assist in solving.

Chief Judge ERVIN and Judge MICHAEL join in this dissent.

MURNAGHAN, Circuit Judge, dissenting:

I dissent.

While the majority has some basis for adopting the reasoning that the term "employee" as used in the statute does not in any case extend to a one-time, former or ex-employee, it is insufficient. In his dissent, Judge Hall convincingly points out the more compelling reasons for reaching the opposite conclusion, regardless of whether the term "employee" in one sense, and in certain circumstances not present here, has a plain meaning or is truly ambiguous. After all, despite the long lapse of time, Joe DiMaggio can still be referred to as a center fielder for the New York Yankees.

Chief Judge ERVIN joins in this dissent.

---

9. For example, a manufacturing concern may have been, or will be, a major "employer," without regard to any particular worker. Similarly, a recent retiree of Company X receiving a gold watch for his or her faithful service may be introduced at the year-end awards banquet as a long-time "employee" of the company.